# CIRCUIT COURT OF CHESTERFIELD COUNTY

Ford Motor Credit Co.

v.

Chesterfield County

## Case No. CL07-418

By Judge Michael C. Allen

## May 19, 2009

This matter is before the Court on the application of Ford Motor Credit Corporation ("FMCC") for correction of assessments of business, professional, and operational license ("BPOL") taxes assessed by Chesterfield County for tax years 2001 through 2004. For the reasons that follow, the Court will deny the application and dismiss the application. The Court has previously dismissed a counterclaim filed by Chesterfield County.

### Background

After review of the evidence, the Court makes the following findings of fact.

A. *FMCC's Corporate Structure and Business Operations*

FMCC is a wholly owned subsidiary of Ford Motor Company. From its headquarters in Dearborn, Michigan, FMCC manages over 300 locations worldwide. Until it was closed in 2007, FMCC operated a sales office, the "Richmond Branch," at 7401 Beaufont Springs Drive in Chesterfield County, Virginia.

The majority of FMCC's business can be divided into three categories: retail financing, wholesale financing (also called "floor plan financing"), and a third, catchall category referred to as "other financing." The Richmond Branch operated as a loan origination office, performing all three financing functions. However, most of the loans marketed and closed by the Richmond Branch were consumer loans for individual new and used cars.

At all times relevant to this action, the Richmond Branch operated within a distinct sales territory to the exclusion of other FMCC sales offices. FMCC reported none of the gross receipts taxed by Chesterfield County for taxation in any other state, and no portion of the gross receipts generated by the Richmond Branch were taxed by, or rendered subject to taxation by, any other jurisdiction.

After closing, loans generated by the Richmond Branch were transferred for portfolio management to "service centers" organized and operated by FMCC in three other states: the service center in Columbia, Maryland, handled customer contacts, collected on the loans, and followed up on loan questions and delinquent accounts; the National Bankruptcy Service Center in Livonia, Michigan, was responsible for the collection and maintenance of accounts of borrowers in bankruptcy; and the National Recovery Center in Mesa, Arizona, managed bad debts and delinquent accounts. The service centers neither created new loans nor added value to existing loans; they simply managed loans generated and closed by the Richmond Branch. The service centers did not generate gross receipts.

Operations of the Richmond Branch were overseen by a regional office in Chantilly, Virginia, and by FMCC corporate headquarters in Dearborn, Michigan. These offices, known as "cost centers," provided assistance to the Richmond Branch in matters of management policy and procedures but, like the service centers, neither office generated gross receipts.

## B. *FMCC's Accounting System (MAPS)*

When the Richmond Branch closed a loan, it generated gross receipts in the form of interest and fees. FMCC recorded the loans as receivables and forwarded them to service centers for servicing and collection.

During the period in question, FMCC utilized an accounting system, known as "MAPS," which allowed the company to accurately track the gross receipts generated by each sales office. Through MAPS, gross receipts generated by the Richmond Branch were attributed to the Richmond Branch only, and gross receipts generated by other sales offices operating in other jurisdictions were not attributed to the Richmond Branch.

The MAPS accounting system enabled FMCC to calculate the amount of gross receipts generated by the Richmond Branch "to the penny." The gross receipts figures reported by FMCC to the County for tax years 2001 through 2004 were calculated using MAPS.

FMCC asserts the MAPS figures for the Richmond Branch were intended for internal management purposes only and do not reflect economic reality as to where the gross receipts were generated. The Court finds, however, that the MAPS figures accurately reflect the gross receipts generated as the result of the distinct efforts of the Richmond Branch.

*Analysis*

A. *Statutory Basis for Imposition of BPOL Tax*

Virginia Code § 58.1-3703(A) provides the statutory basis for the County's imposition of BPOL taxes on businesses generating gross receipts within its jurisdiction.

The general rule for determining the situs of a business engaged in the provision of business services is set forth in Va. Code § 58.1-3703.1(A)(3)(a)(4):

> The gross receipts from the performance of services shall be attributed to the definite place of business at which the services are performed or, if not performed at any definite place of business, then to the definite place of business from which the services are directed or controlled.

Here the evidence clearly demonstrates the Richmond Branch's marketing and closing operations generated gross receipts in the form of interest and fees. Because the Richmond Branch generated gross receipts from a definite place of business in Chesterfield County, imposition of BPOL tax on the gross receipts generated by FMCC's Chesterfield location is consistent with the applicable statute.

B. *Apportionment*

Under certain circumstances, the gross receipts of a licensee may be apportioned by payroll for the purposes of assessing BPOL tax:

> If the licensee has more than one definite place of business and it is *impractical or impossible* to determine to which definite place of business gross receipts should be attributed under the general rule, the gross receipts of the business shall be apportioned between the definite places of businesses on the basis of payroll. Gross receipts shall not be apportioned to a definite place of business unless some activities under the applicable general rule occurred at, or were controlled from, such definite place of business. Gross receipts attributable to a definite place of business in another jurisdiction shall not be attributed to this jurisdiction solely because the other

> jurisdiction does not impose a tax on the gross receipts attributable to the definite place of business in such other jurisdiction.

Va. Code § 58.1-3703.1(A)(3)(b) (emphasis supplied).

While it is true that FMCC operates more than one definite place of business — the company points specifically to the activities of its "service centers" and "cost centers" — it is also true that determination of the gross receipts generated by the Richmond Branch of FMCC is neither impractical nor impossible. FMCC's own accounting system, MAPS, provides a reliable and accurate accounting of the gross receipts generated by the Richmond Branch for each of the tax years at issue.

Moreover, neither the three "service centers" in Maryland, Michigan, and Arizona, nor the "cost centers" in Michigan and Virginia, generated gross receipts within the meaning of applicable BPOL guidelines. These offices were established for the convenience of FMCC and their operations served the interests of FMCC only. The BPOL Guidelines make clear that activities of a taxpayer which serve only the taxpayer's interest are not considered as generating gross receipts. BPOL Guidelines, § 2.5 (2000).

For these reasons, apportionment is not appropriate in this case, and the Court declines to attribute FMCC gross receipts by payroll apportionment pursuant to Va. Code § 58.1-3703.1(A)(3)(b).

## C. *City of Lynchburg v. English Construction Co.*

In an opinion handed down a very short time ago, the Supreme Court of Virginia affirmed a circuit court decision holding that a locality's assessment of licensing taxes on gross receipts earned by a contractor at a definite business outside the locality was invalid. *City of Lynchburg v. English Construction Co.*, 277 Va. 574, 675 S.E.2d 197 (2009).

In that case, the City of Lynchburg assessed BPOL tax against a company that maintained definite places of businesses and generated gross receipts not only in Lynchburg, but in other localities as well. When the city imposed assessments on receipts from work performed in the other localities, the company challenged the assessments. 277 Va. at 579. The trial court ruled the assessments were erroneous, and the Supreme Court affirmed. 277 Va. at 584-85. FMCC contends the ruling in *English Construction* supports its application in the case at bar, and urges this Court to adopt the same result.

FMCC's reliance on *English Construction* is misplaced. There, the parties filed a written stipulation of facts specifically agreeing that the assessments imposed by the City of Lynchburg were based on over $100 million in gross receipts generated *outside* the city. 277 Va. at 578.

In contrast, FMCC and Chesterfield County dispute the situs where the gross receipts at issue in this case were generated, a dispute the Court has resolved in favor of the County. Clearly, the County cannot assess BPOL

tax on gross receipts derived from services performed outside the county. Had the assessments complained of by FMCC been based on gross receipts from services performed at a definite place of business outside Chesterfield County, *English Construction* would dictate a different conclusion. The Court's factual finding, however, is that the assessments in this case were based solely on gross receipts generated by the Richmond Branch for services performed within the County. The assessments are therefore not invalidated by the Supreme Court's decision in *City of Lynchburg v. English Construction Co.*

## D. *Commerce Clause*

In order for a local tax to be valid under the Commerce Clause of the United States Constitution, the tax must be: (1) applied to an activity with a substantial nexus to the taxing authority, (2) fairly apportioned, (3) non-discriminatory to interstate commerce, and (4) fairly related to services provided by the locality. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977).

As to three of these four criteria, the parties offer no real argument. Neither FMCC nor the County disputes that the BPOL tax is applied to an activity with a substantial nexus to the County, that the BPOL tax is non-discriminatory to interstate commerce, or that the BPOL tax is fairly related to services provided by the County. The parties do, however, contest whether the tax assessments at issue were fairly apportioned.

In *City of Winchester v. American Woodmark Corp.*, 252 Va. 98, 471 S.E.2d 495 (1996), the Supreme Court of Virginia had occasion to apply the four-part test set out in *Complete Auto*. FMCC asserts *American Woodmark* is of particular significance, as the controversy in that case centered on the same question now before this Court: were the taxes assessed by the locality fairly apportioned? In *American Woodmark* the answer was no.

FMCC argues that application of the holding of *American Woodmark* should produce the same finding in the present case. The Court does not agree.

American Woodmark operated twenty-four facilities in thirteen different states, only one of which was located in the City of Winchester. The city nonetheless based its assessments on 100% of the company's total revenues, attributing income from all sources to the company's Winchester operations. On review, the Court found the business conducted in locations outside Winchester constituted revenue-producing activity that added value to American Woodmark's product. The Court concluded the assessments imposed on those revenues were "out of all appropriate proportion" and had "no rational relationship" to the company's Winchester operations. *Id.* at 103. Accordingly, the Court found the assessments were not fairly apportioned.

Like the taxpayer in *American Woodmark*, FMCC operates multiple locations in many states. Unlike the City of Winchester, however, Chesterfield County did not base its BPOL assessments on 100% of the taxpayer's revenues. To the contrary, the County calculated the assessments on a small fraction of FMCC's total revenues, specifically, the gross receipts generated exclusively through the efforts of the Richmond Branch.

FMCC contends the operations of its "service centers" and "cost centers" add value to its business product and, therefore, are analogous to the operations carried out by American Woodmark at locations outside the City of Winchester. In the Court's view, the evidence does not support this comparison. The operations of the "service centers" consisted of administering receivables already booked by FMCC. FMCC's servicing of its own receivables is a cost of doing business, not a revenue-producing activity like those described in *American Woodmark*. And, while the policy development and management assistance provided by the two "cost centers" may have also been necessary to the operation of FMCC's sales offices, neither did they add value to the receivables generated by the Richmond Branch.

The present matter also differs from *American Woodmark* in that the income attributed to the Richmond Branch was not "out of all appropriate proportion" to the business transacted in the locality, as was true in *American Woodmark*. On the contrary, the income attributed to the Richmond Branch was rationally related to the business transacted in the County as tracked by, and attributed to, the Richmond Branch through FMCC's own MAPS accounting system.

For these reasons, the Court concludes the Supreme Court's decision in *American Woodmark* does not compel the result urged by FMCC.

Finally, a taxpayer may also show that an assessment violates the Commerce Clause by demonstrating that the assessment puts the taxpayer at risk of double taxation. The burden of proof in such cases rests on the taxpayer. *Short Bros., Inc. v. Arlington County*, 244 Va. 520, 527, 423 S.E.2d 172 (1992), *citing* Va. Code § 58.1-3984; *Department of Taxation v. Westmoreland Coal Co.*, 235 Va. 94, 99, 366 S.E.2d 78 (1988). The taxpayer is not required to establish that double taxation is actually occurring. To make out a violation of the Commerce Clause, it need only be shown that the taxpayer is exposed to the possibility of double taxation. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 184-85, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995).

FMCC has not met this burden. FMCC did not demonstrate that any portion of the gross receipts generated by the Richmond Branch were taxed by, or subject to being taxed by, any other jurisdiction during the time period in question.

Finding the County's assessments were fairly apportioned and that FMCC has not demonstrated it was exposed to double taxation, the

Court concludes the challenged assessments were not in violation of the Commerce Clause of the United States Constitution.

*Conclusion*

By clear and convincing evidence, Chesterfield County has proved it had the authority to impose BPOL tax on FMCC's Chesterfield office. Judged by the standards set forth in the BPOL Guidelines and the Virginia Code, the County employed appropriate methodology to make the assessments. The Court finds no legal basis for apportionment pursuant to Va. Code § 58.1-3703.1(A)(3)(b).

FMCC has not met its burden to "demonstrate by clear and cogent evidence that the income attributed to the state is in fact out of all appropriate proportions to the business transacted in the state, or has led to a grossly distorted result." *City of Winchester v. American Woodmark Corp.*, 252 Va. 98, 102-03, 471 S.E.2d 495 (1996). FMCC has neither demonstrated the possibility of double taxation nor shown that the assessments in controversy are otherwise invalid or illegal. Va. Code § 58.1-3984.

Accordingly, Ford Motor Credit Company's application for correction of erroneous assessments of BPOL tax for tax years 2001 through 2004 are denied, the tax assessments made by the Chesterfield County Commissioner of the Revenue for the years 2001-2004 are affirmed, and this matter will be dismissed with prejudice.

BY JUDGE STEVEN C. MCCALLUM

August 9, 2013

This case is on remand from the Supreme Court of Virginia's decision in *Ford Motor Credit Co.* ("FMCC") v. *Chesterfield County* ("Chesterfield"), 281 Va. 321 (2011), to determine: (1) what payroll apportionment formula should be used to calculate FMCC's Business, Professional, and Occupational License ("BPOL") tax liability to Chesterfield; and (2) whether FMCC is entitled to an out-of-state deduction under Virginia Code § 58.1-3732(B)(2). An order was entered on January 25, 2013, directing the parties to prepare memoranda outlining their respective positions on each issue. On April 18, 2013, the parties appeared before this court and argued cross-motions for summary judgment. At the conclusion of the hearing, the court took the matter under advisement. After a thorough review of the record in this case and the applicable law, this letter will state the court's rulings.

## I. *Material Facts and Proceedings*

The material facts of this case are uncontested. *FMCC*, 281 Va. at 326. FMCC is a subsidiary of Ford Motor Company. FMCC is a financial services provider which finances automobile purchases and leases, dealer floor plans, and dealer capital loans. *See id.* FMCC maintained a sales office located at a definite place of business in Chesterfield County (the "Richmond Branch"), until the Richmond Branch closed in 2007. The Richmond Branch was one of FMCC's 300 sales offices and one of three branches operating in the Commonwealth of Virginia from 2001 to 2004, which are the tax years in dispute (the "Disputed Years"). *Id.* at 326–27. The principal role of the Richmond Branch was to review loan applications from customers seeking to purchase or lease a vehicle from a Ford Motor Company dealership. *Id.* at 327. The Richmond Branch also reviewed Primus loan applications for non-Ford branded vehicles, and was involved in floor plan financing and dealership loan financing. *Id.* at 328. During the Disputed Years, the Richmond Branch reviewed approximately 20,000 loans annually. *Id.* at 327. The Richmond Branch's involvement with the loans ceased once the loan package was sent to another FMCC office. *Id.*

Specifically, after the loan package left the Richmond Branch, an integrated network of FMCC regional and national support offices handled all remaining aspects of the financing relationship with the customer. *See id.* These other FMCC offices which played a role in managing and administering loans that originated at the Richmond Branch were located in Chantilly, Virginia; Dearborn, Michigan; Nashville, Tennessee; Baltimore, Maryland; Mesa, Arizona; Livonia, Michigan; and Omaha, Nebraska (collectively, the "Contributing Offices"). *See id.* at 327–28. The Richmond Branch reported directly to the regional Chantilly office, but had no interaction with any other FMCC branch located within the Commonwealth. *See id.; see also* Summ. J. Hr'g Tr. 27:15–25, Apr. 18, 2013. The Dearborn, Michigan, office is where Ford Motor Company is headquartered. During the Disputed Years, the Dearborn office promulgated loan review policies and procedures, handled advertising, secured capital, and packaged loan portfolios for securitization. *FMCC*, 281 Va. at 328. The Baltimore, Maryland, service center did "the bulk of the work" relating to receipt of monies from loans closed by the Richmond Branch, including processing loan payments, maintaining accurate customer contact records, and working with customers regarding late payments, refinancing and titling of vehicles paid in full. *See id.* at 327. The Omaha, Nebraska, office handled the overflow of loans reviewed by the Richmond Branch. *Id.* Primus loans originating in the Richmond Branch were forwarded to the Nashville, Tennessee, branch, while the national recovery center in Mesa, Arizona, handled loans that went into default. *See id.* Finally, the Livonia, Michigan, office handled accounts from the Richmond Branch that became involved in bankruptcy proceedings. *Id.* at 328.

During the Disputed Years, the Richmond Branch maintained an internal accounting "management, analysis, and performance system" known as "MAPS." MAPS is a "contract revenue based" accounting system, meaning it tracks gross receipts derived from loan contracts to the originating dealer and branch. *See id.* at 330–31. During the Disputed Years, FMCC filed BPOL tax returns with Chesterfield, which reported 100% of the MAPS receipts. *See id.* at 326. However, on March 16, 2004, FMCC filed an application with the Tax Commissioner to revise FMCC's self-assessment for the Disputed Years, claiming that FMCC had over-reported its receipts subject to Chesterfield's BPOL tax. That application was denied on March 26, 2004. *See id.* After an initial nonsuit, FMCC filed an action in this court on February 16, 2007, challenging the tax assessment on the grounds that it violated the Commerce Clause for Chesterfield to tax 100% of the MAPS receipts, because not all MAPS receipts were attributable to services performed at the Richmond Branch. *See id.*

A two-day trial was held on January 28–29, 2008. The Honorable Michael C. Allen (Ret.) issued a letter opinion dated May 19, 2008, affirming Chesterfield's BPOL tax assessment for the Disputed Years and dismissing FMCC's application for relief with prejudice. Judge Allen held that FMCC did not meet its burden to demonstrate that any portion of the Richmond Branch MAPS receipts were taxed by, or subject to being taxed by, any other jurisdiction. *Id.* Accordingly, FMCC failed to show that the assessment violated the Commerce Clause by risking double taxation. *Id.* The court did not reach the out-of-state deduction issue.

FMCC appealed to the Supreme Court of Virginia, framing the issue as "whether the trial court erred in holding that [Chesterfield] properly attributed all [MAPS] receipts for loans that originated in the Richmond Branch to FMCC's services provided in [Chesterfield], without apportionment or deduction." *FMCC*, 281 Va. at 333–34. The Supreme Court concluded that the MAPS receipts for the Disputed Years were attributable in part to services provided by the Contributing Offices located outside Chesterfield and that "the BPOL taxable measure must be reduced accordingly." *See id.* at 337–39 (internal quotation marks omitted). Relying on its decision in *City of Winchester v. American Woodmark Corp. (Woodmark II)*, 252 Va. 98 (1996), and the rulings of the Virginia Department of Taxation, the Supreme Court held that because it was "impractical or impossible to determine to which definite place of business [the MAPS] receipts should be attributed, FMCC's BPOL tax assessment must be calculated using payroll apportionment." *Id.* at 342 (*citing* Va. Code Ann. § 58.1-3703.1(A) (3)(b)). The Supreme Court further held that, once the tax assessment was recalculated, FMCC's entitlement to an out-of-state deduction under Virginia Code § 58.1-3732(B)(2) must be determined. *Id.* at 343. The Supreme Court remanded the case to this court to determine what payroll apportionment methodology should be applied and what, if any, out-of-

state deduction FMCC is entitled to receive under Virginia Code § 58.1-3732(B)(2). *See id.* at 343 and n. 8.

## II. *Standard of Review*

In reviewing a motion for summary judgment, the court must accept as true those inferences from the facts that are most favorable to the non-moving party, unless the inferences are forced, strained, or contrary to reason. *See, e.g., Dickerson v. Fatehi*, 253 Va. 324, 327 (1997). Summary judgment is available only when there are no material facts genuinely in dispute. *Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 618 (2005). Thus, if the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence, summary judgment is not appropriate. *See Jenkins v. Pyles*, 269 Va. 383, 388 (2005).

## III. *Analysis*

### A. *Payroll Apportionment Formula*

In determining the proper payroll apportionment formula to apply in this case, the court's analysis is guided by two overarching principles. First, the situsing rules set forth in Virginia Code § 58.1-3703.1(A) mandate that the portion of FMCC's gross receipts subject to Chesterfield's BPOL tax must be "directly attributable to the taxable privilege exercised [by the Richmond Branch in Chesterfield]." *See* Va. Code Ann. § 58.1-3703.1(A)(9). Second, the Commerce Clause dictates that the tax imposed must apply only to the portion of gross receipts from the interstate activity which reasonably reflects the instate component of the licensable privilege being taxed. *See FMCC*, 281 Va. at 338 (*citing Woodmark II*, 252 Va. at 102 (citation omitted)). The parties agree that the payroll apportionment formula adopted by the court must account for these considerations. The parties have also reached common ground regarding the general format of the formula. The basic or "national" apportionment formula is set out in Ruling of the Tax Commissioner P.D. 04-80 as follows:

| BPOL Gross Receipts | x | County Payroll |
| Everywhere | | Payroll Everywhere |

*See* P.D. 04-80 (Aug. 25, 2004). Notably, the Supreme Court of Virginia cited P.D. 04-80 in support of its ruling that payroll apportionment is required in this case. *FMCC*, 281 Va. at 342. However, the parties disagree with respect to the components of the formula in this case. Each party's proposed formula is set out below:

*FMCC's Proposed Formula*

| | | |
|---|---|---|
| MAPS Gross Receipts | x | Richmond Branch Payroll |
| from Richmond Branch | | Richmond Branch Payroll plus Contributing Offices Payroll |

*Chesterfield's Proposed Formula*

| | | |
|---|---|---|
| Virginia Statewide | x | Direct Richmond Branch Payroll |
| Gross Receipts | | Direct Virginia Statewide Payroll |

The parties' positions with respect to each component of the formula are discussed below.

The court's analysis must begin with the gross receipts component of the formula, because the scope of gross receipts to be apportioned (e.g. only MAPS receipts from Richmond Branch or total Virginia receipts) dictates what figures to use for the payroll fraction. *See* Summ. J. Hr'g Tr. 15:11–18, Apr. 18, 2013; *see also* J.A. 319 (direct examination of James May, C.P.A., explaining that the first step of the apportionment process is to establish gross receipts). FMCC asserts that the prior Supreme Court decision in this case already decided this issue, and determined that the scope of gross receipts to be apportioned is the MAPS receipts. Moreover, FMCC asserts that this component of the formula has never been in dispute; Chesterfield used the MAPS receipts as its tax base at the trial stage, and both the trial court and the Supreme Court accepted this number as correct. Summ. J. Hr'g Tr. 17:11–19, Apr. 18, 2013. FMCC further argues that the MAPS receipts constitute 100% of the receipts from loans tracked to the Richmond Branch, leading to the logical conclusion that some portion of these receipts is directly attributable to the Richmond Branch's business activity in Chesterfield. FMCC concluded that MAPS receipts are the most accurate taxable measure, while simultaneously adhering to the situsing rules and the Commerce Clause considerations that provide the framework for deriving the proper payroll apportionment formula.

Chesterfield, however, asserts that the Supreme Court threw out the MAPS receipts approach when it reversed the trial court's decision and remanded the case to this court to determine the proper apportionment formula. Moreover, Chesterfield contends that FMCC's formula is at odds with the Rulings of the Tax Commissioner. Specifically, Chesterfield cites P.D. 11-95 and P.D. 10-230 to support its position that a statewide apportionment method is required in this case because the Richmond Branch "can attribute its sales to its definite places of business within the Commonwealth." *See* P.D. 11-95 (June 7, 2011); P.D. 10-230 (Sept. 28, 2010). Virginia statewide gross receipts and Virginia statewide payroll lead

to a taxable measure that is "closer to home," according to Chesterfield, because it ensures a more precise attribution of gross receipts to the Richmond Branch. (Chesterfield's Mem. in Supp. of Mot. for Partial Summ. J., at 14, Apr. 1, 2013) (hereinafter "Chesterfield's Mem.").

The court disagrees with Chesterfield's position that a statewide method is required in this case. The Tax Commissioner opinions cited by Chesterfield in support of its position are factually distinguishable from FMCC's case. The cited cases involve a taxpayer's challenge to a Virginia city's tax assessment on the grounds that it included receipts attributable to a Virginia county, thus making a Virginia-focused formula appropriate. By contrast, FMCC is challenging Chesterfield's tax assessment on the grounds that it includes receipts attributable to multiple Contributing Offices, all of which, save the Chantilly office, are located outside the Commonwealth of Virginia, thus making a strictly Virginia-focused formula less appropriate. Moreover, because the Richmond Branch had no interaction with the two other Virginia branch sales offices, the Richmond Branch's gross receipts cannot be attributed in any sense to the other Virginia sales offices. This again makes a Virginia statewide receipts and Virginia payroll approach less appropriate. Bolstering the court's view is the Supreme Court's finding in *FMCC* that the Contributing Offices contributed to the derivation of the Richmond Branch's gross receipts and that "those [financial] services must be accorded some proportion of the gross receipts and the BPOL taxable measure reduced accordingly." *See FMCC*, 281 Va. at 339 (*citing Woodmark II*, 252 Va. at 103) (internal quotation marks omitted). This imperative can only be satisfied by an apportionment formula that includes Contributing Offices payroll as a component. Finally, to ignore the interstate involvement of the Contributing Offices by apportioning only on a Virginia statewide basis would run afoul of the Commerce Clause.

The court agrees with FMCC that the MAPS receipts accurately reflect the gross receipts to be apportioned in this case. The Supreme Court accepted this as a given (because it was not then in dispute) when it defined the "dispositive issue" as "whether the circuit court erred in holding that [Chesterfield] properly attributed all gross receipts for loans that originated in the [Richmond] Branch [i.e., the MAPS receipts] to FMCC's services provided in [Chesterfield], without apportionment or deduction." *See id.* at 333–34; *see also id.* at 337 (framing the issue as whether FMCC proved that the MAPS receipts were not attributable solely to the performance of financial services within Chesterfield). In other words, the Supreme Court held that Chesterfield could not tax 100% of the MAPS receipts, and it remanded the case to this court to determine what portion of the MAPS receipts are subject to Chesterfield's BPOL tax assessment.

FMCC's position is also consistent with the Ruling of the Tax Commissioner P.D. 04-80. The facts of that case are strikingly similar to FMCC's case. The taxpayer at issue in P.D. 04-80 was a multi-state

information technology consulting firm that performed under "thousands of contracts" throughout the country for the federal government. *See* P.D. 04-80 (Aug. 25, 2004). The contract services were performed in and directed and controlled by multiple offices maintained by the taxpayer in several different states. *Id.* Like FMCC, the taxpayer in P.D. 04-80 could not determine which gross receipts were directly attributable to its offices exercising licensable privileges within the taxing locality because its accounting system was contract driven, rather than service driven. *Id.* The Tax Commissioner ruled that payroll apportionment was appropriate and that, under the Commerce Clause, each component of the apportionment formula should be directly linked to services performed at definite places of business within the locality. *See id.* (*citing Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274 (1977) ("This method of apportionment is based purely on gross receipts and captures only the relationship between the County's payroll and the percentage of gross receipts apportioned to the County.")). And so in this case, because the MAPS receipts represent 100% of the gross receipts from contracts originating at the Richmond Branch, they bear the most direct and rational relationship to FMCC's business activity in Chesterfield. Moreover, the MAPS receipts will yield the most precise taxable measure because some portion of the MAPS receipts are receipts actually attributable to FMCC's business activity in Chesterfield.

One of Chesterfield's principal arguments against the apportionment formula proposed by FMCC is one of convenience: using FMCC's formula will require the parties to conduct additional discovery because the current record does not contain total payroll data for all of the Contributing Offices. (Chesterfield's Mem. at 14.) As the court stated at the April 18 hearing, considerations of mere convenience must yield to legal principles; correctness trumps convenience. If additional discovery is needed to derive the most accurate taxable measure, so be it. *See* Summ. J. Hr'g Tr. 32:2–19, Apr. 18, 2013.

### 1. *Direct versus Indirect Payroll Calculation*

While the scope of total gross receipts dictates what payroll figures are used, there remains a dispute between the parties as to which employees' payroll expenses should be included in calculating the apportionment fraction. FMCC contends that, pursuant to P.D. 04-80, the payroll apportionment fraction should include the total payroll in both the numerator and denominator. This includes direct payroll as well as "indirect" payroll, meaning the payroll of administrative employees who do not directly contribute to generating revenue. Chesterfield, however, cites several Rulings of the Tax Commissioner to support its position that the payroll fraction can include only the payroll of those employees who directly participate in generating gross receipts. This is known as the direct payroll approach, and was first used in P.D. 97-284. *See* P.D. 05-118 (July

19, 2005); P.D. 01-05 (Jan. 4, 2001); P.D. 99-87 (April 23, 1999); P.D. 97-308 (July 22, 1997); P.D. 97-284 (June 25, 1997).

The Supreme Court of Virginia did not reach the issue of the composition of the payroll fraction. *See FMCC*, 281 Va. at 343, n. 8 ("We express no opinion regarding … what portion of FMCC's payroll should be included in the payroll apportionment calculation."). The court must, therefore, turn to the Rulings of the Tax Commissioner, the arguments of the parties, and its own common sense in deciding the issue. What is clear to the court in comparing P.D. 97-284 and its progeny with P.D. 04-80 is that they prescribe two different methods for calculating payroll and the methods appear to be inconsistent. P.D. 97-284, which exemplifies a direct payroll calculation, states that only direct employee payroll can be used in the payroll calculation. By contrast, the total payroll method outlined in P.D. 04-80 includes "overhead employees" in its payroll calculation, meaning both direct and indirect payroll costs are included. The disparity between these rulings was acknowledged at trial by FMCC's expert, James May, C.P.A., but he ultimately followed the direct payroll method prescribed in P.D. 97-284 because "it favors the taxing authority." J.A. 329, 339–40 (showing that, in 2004, for example, the payroll factor would have been 0.3541% using the direct payroll method, but would have been 0.326% using the total payroll method). However, Mr. May admitted that some FMCC employees such as accountants, who would typically be defined as "overhead employees," and, therefore, excluded from a direct payroll calculation, may have actually assisted in generating revenue in this case because, without them to manage the income stream of the company, FMCC would not be profitable. J.A. 332. Accordingly, he conceded that there is "a good argument" to apportion payroll here as the Tax Commissioner did in P.D. 04-80, because the vast majority of FMCC employees contribute to the generation of gross receipts and, therefore, there is little to no overhead to carve out. *See* J.A. 332 (in "the case of an interstate-based business involved in consulting … you include all the payroll for the locations in the taxing jurisdiction … in the numerator and the denominator you include the total payroll of the company"). J.A. 332. In other words, while the factual similarities between P.D. 04-80 and this case weigh in favor of a total payroll calculation, Mr. May followed the direct payroll method set forth in P.D. 97-284, because, in his opinion, it is more conservative and tends to overstate revenue.

Contrary to Chesterfield's position that there is a clear directive from the Tax Commissioner to calculate payroll using only the payroll of employees who generate revenue, P.D. 04-80 suggests that, in the context of a multi-state service provider who uses a contract based system to track revenue and is, therefore, unable to ascertain where, when, or by whom specific services were performed, a payroll apportionment calculation using total employee payroll is warranted. As in P.D. 04-80, FMCC utilized a contract

based revenue accounting system during the Disputed Years, which made it "impossible, or at least impractical" to determine to which FMCC branch receipts should be attributed. *See FMCC*, 281 Va. at 342. This leads *a fortiori* to the conclusion that it would also be "impossible, or at least impractical," to determine which employees in which FMCC branch worked on the Richmond Branch contracts and how much time each employee spent on each contract. *See* J.A. 360–61 (testimony of James May, C.P.A., stating that he cannot ascertain how out-of-state employees were involved in FMCC's financial services business in Chesterfield or which employees were directly involved in the generation of gross receipts).

For all of these reasons, the court concludes that the total payroll calculation, including all direct and indirect payroll, is more appropriate in this case. Also influencing the court's decision with respect to this issue is the fact that both parties seem to agree that a fraction derived from total payroll in the numerator and total payroll in the denominator and a fraction derived from direct payroll in the numerator and direct payroll in the denominator are not likely to be significantly different. Apples-over-apples or oranges-over-oranges, the fraction is not likely to be significantly different. *See, e.g.*, Summ. J. Hr'g Tr. 67:6–9, Apr. 18, 2013.

### 2. *Richmond Branch and Contributing Offices Payroll*

Chesterfield disagrees with FMCC's proposed denominator of "Richmond Branch Payroll plus Contributing Offices Payroll" on the grounds that it is at odds with P.D. 04-80 in which the Tax Commissioner held that the Total Payroll Everywhere denominator includes only the payroll that contributes to the generation of the total gross receipts. According to Chesterfield, there is a logical disconnect in FMCC's proposed formula because FMCC's denominator includes payroll for the Contributing Offices, but the Contributing Offices did not dedicate 100% of their employees' payroll towards supporting the Richmond Branch to generate the MAPS receipts. Instead, the employees in the Contributing Offices also supported the other 300 FMCC sales branches. Summ. J. Hr'g Tr. 48–49:21–25, 1–8, Apr. 18, 2013. To rectify this imbalance, Chesterfield contends that the total gross receipts for the Contributing Offices would need to be added to the Richmond Branch's MAPS receipts for a new total gross receipts of "Richmond Branch MAPS Receipts plus Contributing Offices Gross Receipts."

FMCC concedes that, at first blush, there is a logical disconnect in the relationship between the "MAPS Receipts from the Richmond Branch" component and the "Richmond Branch Payroll plus Contributing Offices Payroll" component in their formula. *See* Summ. J. Hr'g Tr. 85:1–17, Apr. 18, 2013. However, FMCC defends its position by noting that, while its formula will not reflect precisely how much time, money, and energy the Contributing Offices allocated to the Richmond Branch, such is the nature

of payroll apportionment; it is an approximation, and MAPS still gives us the best approximation of the taxable measure.

The court concludes that FMCC's proposed formula will yield the best and most appropriate approximation of the taxable measure. The MAPS receipts represent 100% of the gross receipts from loans originating at the Richmond Branch and, therefore, bear the most direct relationship to FMCC's exercise of a licensable business activity in Chesterfield. Moreover, the role the Contributing Offices played in generating the MAPS receipts must be taken into account in deriving the apportionment formula. Accordingly, the court accepts FMCC's proposed payroll apportionment formula as the most appropriate formula in this case.

## B. *Entitlement to a Deduction under Va. Code § 58.1-3732(B)(2)*

Next, it must be determined whether FMCC is entitled to an out-of-state deduction under Virginia Code § 58.1-3732(B)(2). Section 3732(B)(2) states: "Any receipts attributable to business conducted in another state or foreign country which the taxpayer … is liable for an income or other tax based upon income" shall be deducted from gross receipts that would otherwise be taxable. *See* Va. Code Ann. § 58.1-3732(B)(2). The Department of Taxation's regulation interpreting this provision clarifies that "[a] Virginia taxpayer is liable for income or other tax based upon income [on receipts attributable to business conducted in another state or foreign country] if the taxpayer files a return for an income or income-like tax in that state or foreign country. The Virginia taxpayer, however, need not actually pay any tax to take the deduction." 23 V.A.C. § 10-500-80(A)(2). When, as in this case, payroll apportionment is required to attribute gross receipts to a locality, entitlement to § 3732(B)(2) deduction is determined by applying a three-prong inquiry. First, it must be ascertained "whether any employees at the Virginia definite place of business participated in interstate transactions by … participating with employees in other offices in generating income." *See* P.D. 12-89 (May 31, 2012); P.D. 12-88 (May 31, 2012). Second, it must be determined whether interstate participation can be tied to specific receipts. *Id.* If not, under the third prong of the analysis, the payroll factor used for the definite place of business in the taxing locality must be applied to gross receipts previously assigned to definite places of business in states in which the taxpayer files an income or income-like return. *See id.*

FMCC contends that it is entitled to a § 3732(B)(2) deduction because (1) Richmond Branch employees participated in interstate transactions by sending their loan contracts out of state to the various Contributing Offices, and (2) FMCC filed income or income-like returns in Maryland, Tennessee, Nebraska, and Michigan. J.A. 50. Chesterfield, on the other hand, claims that FMCC is not entitled to a § 3732(B)(2) deduction because the Richmond Branch employees worked only in Richmond with local customers and did not travel out of state to generate gross receipts. Accordingly, they did not

participate in interstate transactions, Chesterfield contends. *See* Summ. J. Hr'g Tr. 115:4–18, Apr. 18, 2013.

While the Supreme Court did not reach the deduction issue in *FMCC*, the Court's findings suggest that, at the very least, Richmond Branch employees participated in interstate transactions when they sent their loan contracts to the Contributing Offices:

> Thus, we do not agree with [Chesterfield's] position that gross receipts were generated when, for example, a customer simply signed "on the dotted line" and the loan was made. The gross receipts derived from the exercise of FMCC's licensed privilege to conduct a financial services business — to provide installment and inventory financing — were not attributable solely to the performance of financial services at the Richmond Branch. To accept [Chesterfield's] position and the circuit court's holding would mean that all services necessary to FMCC's deriving gross receipts from its consumer installment and inventory financing operations were provided at the Richmond Branch. But, such are not the facts of this case.

*FMCC*, 281 Va. at 339. While Richmond Branch employees did not physically travel to the Contributing Offices to generate gross receipts in those jurisdictions, they surely participated in interstate transactions by sending loan packages to various Contributing Offices in other states. Moreover, Richmond Branch employees relied on the Contributing Offices to, for example, administer the loans through the average thirty month life of the loan; handle loans that became involved in bankruptcy proceedings; and repossess vehicles in default situations. All of these activities combined to generate revenue on the Richmond Branch loan contracts. *See* Summ. J. Hr'g Tr. 119:9–23, Apr. 18, 2013; *see also FMCC*, 281 Va. at 327–28. Accordingly, the court concludes that FMCC satisfies the first prong of the analysis.

In turning to the second prong, it is clear that interstate participation cannot be tied to specific receipts because FMCC's MAPS system is a contract based, rather than activity based, revenue tracking system. FMCC's accounting expert, James May, testified at trial as follows:

> It is difficult to know at any point in time who is working on that loan … or lease. We know that the loan is not in the [Richmond] [B]ranch, it is out there someplace else, but we cannot tell you that, on this day, someone in the service

> department is working on it or, on this day, that someone up at
> the branch or at Dearborn is working on it.

J.A. 312. Mr. May's testimony conclusively demonstrates that interstate participation cannot be tied to specific receipts.

The third and final prong of the analysis is to apply the payroll factor outlined above to gross receipts previously assigned to definite places of business in states in which FMCC files an income or income-like return. This final prong requires a showing that FMCC actually reported the receipts on out-of-state returns. FMCC claims that the parties have already stipulated that FMCC filed income or income-like returns in Maryland, Tennessee, Nebraska, and Michigan. J.A. 50. Accordingly, FMCC claims it is entitled to a deduction. Chesterfield contests this, claiming that FMCC's accounting expert Robert Clary testified at trial that the Richmond Branch did not report any of its gross receipts outside of Virginia, and, therefore, FMCC is not entitled to a deduction. At the April 18 summary judgment hearing, it became evident that it is not possible to ascertain whether the Richmond Branch receipts were actually reported solely by looking at the face of the out-of-state returns. Accordingly, the court finds that there is a genuine dispute of fact between the parties regarding whether Richmond Branch receipts were actually reported on any out-of-state return. Consequently, the Court finds that the deduction issue is not ripe for adjudication at this summary judgment stage.

The Court will grant FMCC's motion for summary judgment to the extent that the Court rules that FMCC's proposed payroll apportionment is the most appropriate formula in this case. In all other respects, FMCC's motion for summary judgment is denied. The Court denies Chesterfield's motion for partial summary judgment.

May 30, 2014

This case is on remand from the Supreme Court of Virginia's decision in *Ford Motor Credit Co. v. Chesterfield County*, 281 Va. 321 (2011), to determine: (1) what payroll apportionment formula should be used to calculate FMCC's Business, Professional, and Occupational License tax liability to Chesterfield; and (2) whether FMCC is entitled to an out-of-state deduction under Virginia Code § 58.1-3732(B)(2). An order was entered on January 25, 2013, directing the parties to prepare memoranda outlining their respective positions on each issue. On April 18, 2013, the parties appeared before this Court and argued cross-motions for summary judgment. At the conclusion of the hearing, the Court took the matter under advisement. Later, the Court issued a letter opinion on August 9, 2013.

On November 1, 2013, the County filed a Motion To Reconsider Payroll Apportionment Formula. Thereafter, both parties submitted Memoranda of Law in support of their respective positions. A hearing was held on November

15, 2013, on the County's Motion To Reconsider. At the conclusion of the November 15 hearing, the Court invited the parties to submit by letter any further arguments regarding the composition of the denominator of the payroll apportionment formula. The Court received letters from FMCC and the County dated November 25 and November 22, respectively. This letter will state the Court's decision on the County's Motion To Reconsider.

As discussed in more detail below, the Court grants the Motion To Reconsider in one respect: the Court now finds that the appropriate denominator in the payroll apportionment formula is Richmond Branch payroll plus a proportionate share of Contributing Offices' payroll. Thus, the Court finds that the appropriate payroll apportionment formula is:

| MAPS Gross Receipts from Richmond Branch | x | Richmond Branch Payroll |
|---|---|---|
| | | Richmond Branch Payroll plus Proportionate share of Contributing Offices Payroll |

In all other respects, the Motion To Reconsider is denied.

To go back to basics, FMCC's MAPS accounting system can trace car loan receipts back to the FMCC office that originated the loan, here, the Chesterfield office. However, the Supreme Court of Virginia has previously held that Chesterfield cannot assess BPOL tax on 100% of the MAPS receipts traced to contracts originated in Chesterfield. This is so for one factual reason and two legal reasons. The factual reason is that, after a car loan is originated in FMCC's Chesterfield office, a host of other FMCC regional and national offices, dubbed the "Contributing Offices," handle all remaining aspects of the loan and the receipts flowing from the loan. The two legal reasons are these: First, the situsing rules set forth in Virginia Code § 58.1-3703.1(A) mandate that the portion of FMCC's gross receipts subject to Chesterfield's BPOL tax must be "directly attributable to the taxable privilege exercised [by the Richmond Branch in Chesterfield]." See Va. Code Ann. § 58.1-3703.1(A)(9). Second, the Commerce Clause of the United States Constitution (art. I, § 8) requires that the tax imposed must apply only to the portion of gross receipts from the interstate activity which reasonably reflects the instate component of the licensable privilege being taxed. See FMCC, 281 Va. at 338 (citing Woodmark II, 252 Va. at 102).

FMCC's MAPS receipts are attributable in part to services performed in Chesterfield, and in part to services performed at various locations outside Chesterfield. The Supreme Court of Virginia previously held that, because "it is impractical or impossible to determine to which definite place of business gross receipts should be attributed, FMCC's BPOL tax assessment must be calculated using payroll apportionment." See FMCC, 281 Va. at 342. However, the Supreme Court "express[ed] no opinion … regarding what portion of FMCC's payroll should be included in a payroll apportionment

calculation." *Id.* at 343. The Supreme Court remanded the case to this Court to determine the appropriate payroll apportionment formula.

This Court now adopts the payroll apportionment formula stated above. The Court's August 9, 2013, letter opinion explained the use of two components of the formula, MAPS gross receipts from the Richmond Branch and Richmond Branch payroll. As stated, the Court denies the Motion To Reconsider the use of those two components of the formula. But as also stated, the Court grants the Motion To Reconsider the denominator of the formula. Instead of Richmond Branch payroll plus total contributing offices' payroll, the Court now adopts Richmond Branch payroll plus a *proportionate share* of contributing offices' payroll.

It is fundamental that the payroll apportionment methodology is only used when it is impractical or impossible to attribute all gross receipts to a definite place of business in a particular jurisdiction. In such a case, gross receipts are attributed to a particular jurisdiction by application of a payroll ratio or fraction, in which the payroll in the taxing jurisdiction is the numerator. The logic behind the numerator is straightforward. Here, Chesterfield employees were paid by FMCC to originate car loans. Therefore, the Chesterfield payroll was entirely devoted to generating Chesterfield MAPS gross receipts. However, the converse is not true; the Chesterfield MAPS receipts were not entirely due to the labor of Chesterfield employees. FMCC's other Contributing Offices — outside of Chesterfield County — played important roles in generating Chesterfield MAPS receipts. The Supreme Court of Virginia specifically held that "the operations of the Richmond Branch did not produce 100 percent of the gross receipts that the County taxed." *FMCC*, 281 Va. at 340. Accordingly, the contribution of those other offices must be taken into account. Contributions are measured by payroll. Therefore, the Chesterfield contribution is measured by the Chesterfield payroll, and the Contributing Offices' contributions are measured by the payroll in those offices.

The specific challenge raised by the County in its Motion To Reconsider is how to measure the Contributing Offices' payroll — the entire payroll of the Contributing Offices or only some portion of the payroll attributable to those offices' work on the Chesterfield contracts; in other words, the denominator in the payroll apportionment fraction in dispute. In resolving the dispute, consider first that the goal of payroll apportionment is to measure the relative contribution of various offices (using payroll figures) *to the generation of Chesterfield MAPS receipts*. The focus should, therefore, be on what a FMCC Contributing Office does *to generate Chesterfield MAPS receipts*. The County argues on page 7 of its Memorandum in Support of Motion To Reconsider that:

> [I]t is undisputed that 100% of the payroll from those offices [FMCC Contributing Offices] was not dedicated solely to supporting the Richmond Branch. For instance, Dearborn

is the *world* headquarters of FMCC; Nashville is a *regional* loan service center; and Livonia operates the *National* Bankruptcy Service Center. To the contrary, it is undisputed that the function of the various Contributing Offices was to support many, if not *all*, of the approximately 300 other sales offices in addition to the Richmond Branch. Therefore, only a small fraction of the Contributing Offices' payroll could be presumed to have contributed to the generation of the MAPS receipts attributed solely to the Richmond Branch. Consequently, including 100% of the Contributing Offices' payroll overstates the role that payroll played in generating the MAPS receipts to be apportioned... .

The Court agrees with the County on this point. Accordingly, some method must be found to allocate a proportionate share of the Contributing Offices' payroll, in order to reach a reasonable estimate of the Contributing Offices' contribution to the generation of Chesterfield MAPS receipts. During the hearing on November 15, the Court hypothesized that several methods could be used to estimate the portion of the Contributing Offices' payroll attributable to the generation of Chesterfield MAPS receipts. One simple *pro rata* method would be to divide the Contributing Offices' payroll by 300, to represent the 300 individual sales offices supported by the Contributing Offices. Another method could be based on loan volume, using a ratio of car loans originated in Chesterfield to all car loans originated in all sales offices, and applying that ratio against the total Contributing Offices' payroll. Other approaches undoubtedly exist. This Court expresses no opinion at this time regarding the most appropriate method to estimate the portion of the Contributing Offices' payroll attributable to the generation of Chesterfield MAPS receipts. However, the Court is convinced — and so holds — that some allocation method is superior to simply including the totality of the Contributing Offices' payroll.

On a separate matter, it appears that the parties disagree regarding the Court's ruling on the out-of-state deduction issue, under Virginia Code § 58.1-3732(B)(2). The Court's August 9 letter opinion discusses this issue. As explained, the Court found that material facts are in dispute; thus, "the Court finds that the deduction issue is not ripe for adjudication at this summary judgment stage." This remains the ruling of the Court.

June 19, 2015

This case is on remand from the Supreme Court of Virginia's decision in *Ford Motor Credit Co. v. Chesterfield County*, 281 Va. 321 (2011). The remand opinion directed this Court to determine: (1) what payroll apportionment formula should be used to calculate FMCC's Business, Professional, and Occupational License tax liability to Chesterfield, and (2)

whether FMCC is entitled to a deduction under Va. Code § 58.1-3732(B)(2). Issue (1) was addressed in this Court's letter opinions dated August 9, 2013, and May 30, 2014. Issue (2) is addressed in this letter opinion.

The so called out-of-state deduction under Va. Code § 58.1-3732(B)(2) (hereinafter, "Deduction") was succinctly explained by the Supreme Court of Virginia in its recent opinion in *Nielsen Co. (U.S.), L.L.C. v. County Board of Arlington County*, as follows:

> Once the pool of taxable gross receipts is created, certain receipts "shall be deducted" from that pool even though they "would otherwise be taxable." Code § 58.1-3732(B). These "deduction provisions are strictly construed against the taxpayer." *City of Lynchburg*, 277 Va. at 583, 675 S.E.2d at 201. Relevant to this appeal, the General Assembly has provided that the following receipts are subject to deduction: Any receipts attributable to business conducted in another state or foreign country in which the taxpayer (or its shareholders, partners, or members in lieu of the taxpayer) is liable for an income or other tax based upon income. Code § 58.1-3732(B)(2). This provision backs out of the pool of taxable gross receipts — which included receipts both within and outside the licensing jurisdiction that were attributable to the definite place of business's licensed activities under either Code § 58.1-3703.1(A)(3)(a) or (b) — all receipts that accrued from business in non-Virginia jurisdictions in which the taxpayer is subject to an income-based tax liability.

*Nielsen Co. (U.S.), L.L.C. v. County Bd. of Arlington County*, 289 Va. 79, 93, 767 S.E.2d 1, 7 (2015).

FMCC and Chesterfield have filed an Agreed Stipulation which sets out the factual basis on which this Court shall determine whether FMCC is entitled to the Deduction. The Agreed Stipulation states in pertinent part:

> 2. The case was originally tried and the record established on January 29, 2008 ("Record").
> 3. On remand, this Court was directed to determine ... if FMCC is entitled to a deduction pursuant to Va. Code § 58.1-3732(B)(2) ("Required Rulings").
> 4. The evidence necessary for the Court to make the Required Rulings is contained in the Record. The parties have no further evidence to present to the Court.
> 5. There are no material facts in dispute.

Because this Court is charged with making certain determinations on remand, the remand opinion from the Supreme Court of Virginia is the natural starting point. Most of the opinion in *FMCC v. Chesterfield* analyzed

what portion of FMCC's gross receipts should be subject to Chesterfield's BPOL tax. On this point, the Supreme Court held that FMCC's BPOL tax assessment should be calculated using payroll apportionment. But the opinion also addressed, to some extent, the Deduction issue. For example, the Supreme Court framed the "dispositive issue" on appeal as "whether the circuit court erred in holding that the County properly attributed all gross receipts for loans that originated in the Richmond Branch to FMCC's services provided in the County, without apportionment *or deduction*." 281 Va. at 333-34 (emphasis added). Moreover, the Supreme Court specifically directed this Court, on remand, to determine FMCC's entitlement to the Deduction, using this language:

> Finally, when FMCC's BPOL tax assessment is re-calculated, FMCC's entitlement to a deduction under Code § 58.1-3732(B)(2) must be determined. That statute provides that "[a]ny receipts attributable to business conducted in another state or foreign country in which the taxpayer (or its shareholders, partners, or members in lieu of the taxpayer) is liable for an income or other tax based upon income" "shall be deducted from gross receipts ... that would otherwise be taxable." Code § 58.1-3732(B)(2). FMCC contends that the stipulation to its filing "income or income-like tax returns in 47 states and the District of Columbia" means that it was entitled to deduct all gross receipts "attributable to business conducted" in those states. Cf. 23 VAC § 10-500-80(A)(2) ("A Virginia taxpayer is liable for an income or other tax based upon income if the taxpayer files a return for an income or income-like tax in that state or foreign country.") While a "taxpayer ... need not actually pay any tax to take the deduction," 23 VAC § 10-500-80(A)(2), a taxpayer may deduct gross receipts attributable to business conducted in another state only if the taxpayer demonstrates that it "actually reports *those receipts* ... on its out-of-state income tax returns." P.D. 07-142 (Sept. 5, 2007) (emphasis in original).

*Ford Motor Credit Co. v. Chesterfield County*, 281 Va. 321, 342-43 (2011). The Supreme Court added footnote 8 to the passage quoted above, stating that "We express no opinion regarding FMCC's entitlement to a deduction under Code § 58.1-3732(B)(2).... ." 281 Va. at 343.

In the passage quoted above, this statement by the Supreme Court is crucial: "[A] taxpayer may deduct gross receipts attributable to business conducted in another state only if the taxpayer demonstrates that it 'actually reports *those receipts* ... on its out-of-state income tax returns'." (Emphasis in original.) FMCC has conceded in its brief that "it is impossible for FMCC to trace 'otherwise taxable' receipts to income tax returns in jurisdictions

outside of Virginia." Memorandum in Support of FMCC's Motion To Reconsider Deduction Under Va. Code § 58.1-3732(B)(2) ("FMCC Memo") at 4. FMCC's Memo further explains that "it is the very nature of FMCC's MAPS [accounting] system that it is unable to trace any specific receipt to any income tax return in the United States." FMCC Memo at 3.

So is the syllogism as simple as these three steps? (1) The Supreme Court has said that "a taxpayer may deduct gross receipts attributable to business conducted in another state only if the taxpayer demonstrates that it 'actually reports *those receipts* ... on its out-of-state income tax returns'." (Emphasis in original.) (2) FMCC has conceded that it "is unable to trace any specific receipt to any income tax return in the United States." Does it, therefore, follow that (3) FMCC cannot claim the Deduction? Chesterfield answers "yes;" FMCC simply cannot satisfy the requirement set forth by the Supreme Court in order to claim the Deduction. FMCC argues "no;" the Supreme Court's language, and its context, must be analyzed more deeply.

FMCC argues, first, that "the Supreme Court did not reach the deduction issue" in *FMCC v. Chesterfield*. FMCC Memo at 4. Indeed, this Court said the same in its August 9, 2013, letter opinion. It is true that the Supreme Court in *FMCC v. Chesterfield* was not called on to determine FMCC's entitlement to the Deduction. As previously noted, footnote 8 in *FMCC v. Chesterfield* stated "We express no opinion regarding FMCC's entitlement to a deduction under Code § 58.1-3732(B)(2)." So it can fairly be said that the Supreme Court "did not reach the deduction issue." But it is equally true that the Supreme Court was not silent on the Deduction issue. In the passage quoted in this letter opinion, above, the Supreme Court explicitly directed this Court, on remand, to determine FMCC's entitlement to the Deduction. And the Supreme Court's language in the passage quoted must be read as guidance to this Court in how to determine FMCC's entitlement to the Deduction. For example, the Supreme Court clearly rejected FMCC's contention that merely "filing 'income or income-like tax returns in 47 states and the District of Columbia' means that it [FMCC] was entitled to deduct all gross receipts 'attributable to business conducted' in those states." In rejecting this contention by FMCC, the Supreme Court made its position quite clear: "a taxpayer may deduct gross receipts attributable to business conducted in another state only if the taxpayer demonstrates that it 'actually reports *those receipts* ... on its out-of-state income tax returns'." (Emphasis in original.) Respect and effect must be given to this clear statement by the Supreme Court. The statement was not mere *obiter dictum*; it was clear guidance to this Court in making the determination, on remand, of FMCC's entitlement to the Deduction.

FMCC further argues that what the Supreme Court said about Deduction in its 2011 decision in *FMCC v. Chesterfield* has essentially been supplanted by the 2015 decision in *Nielsen*. This Court invited FMCC and Chesterfield to submit letters addressing the impact of the *Nielsen*

opinion. In its February 6, 2015, letter, FMCC assigns great significance to the *Nielsen* opinion. For example, FMCC argues that, notwithstanding "the *FMCC* Court's view of the deduction in 2011 … it is clear from the sweeping holding in *Nielsen* that the Supreme Court of Virginia requires the three-step analysis contained in P.D. 12-146 to be applied in all cases involving claims to an interstate deduction under Code § 58.1-3732(B)(2)." FMCC further asserts that "the holding in *Nielsen* is clear that FMCC is not required to trace specific receipts [to out-of-state tax returns] in order to claim a deduction." FMCC essentially argues that *Nielsen* overrules, *sub silentio*, what the Supreme Court said about the Deduction issue in *FMCC v. Chesterfield*.

This Court is not persuaded by FMCC's arguments. First, the *Nielsen* opinion cites *FMCC v. Chesterfield*, but does not discuss the prior case in any detail. Nothing in *Nielsen* suggests that the Supreme Court is overruling or altering in any way its prior opinion in *FMCC v. Chesterfield*. Second, *Nielsen* focused on the methodology to determine the amount of the out-of-state deduction. The focus was the amount of the deduction, not the entitlement to the deduction. Nothing in *Nielsen* suggests this Court should disregard the clear standard for entitlement to the Deduction, to be applied by this Court on remand, as that standard was set forth in the remand opinion in *FMCC v. Chesterfield*.

On remand, this Court must do what the Supreme Court directed it to do, adhering to the plain meaning of the language in the remand opinion. First, as directed, this Court determined what payroll apportionment formula should be used. Next, this Court undertook to determine, as directed, whether FMCC is entitled to the Deduction. The Supreme Court said in the remand opinion that "a taxpayer may deduct gross receipts attributable to business conducted in another state *only if the taxpayer demonstrates that it 'actually reports those receipts … on its out-of-state income tax returns'*." (Emphasis added.) FMCC concedes that "it is unable to trace any specific receipt to any income tax return in the United States." Since FMCC concededly cannot meet the standard for deductibility set forth by the Supreme Court, FMCC cannot claim the Deduction.

To the extent, if any, that this letter opinion conflicts with prior letter opinions dated August 9, 2013, and May 30, 2014, this letter opinion shall control, and shall reflect the final conclusions of this Court with respect to the matters addressed in this letter opinion.